CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED
MAR 0 9 2007
JOHN F. CORCORAN, CLERK
BY:
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

JO'NATHAN TALBERT,
    Plaintiff,

v.

W. SMITH, et al.,
    Defendants.

Civil Action No. 7:05CV00736

**MEMORANDUM OPINION**

By: Hon. Glen E. Conrad
United States District Judge

Jo'Nathan Talbert, a Virginia inmate proceeding pro se, filed this civil rights action under 42 U.S.C. § 1983 and the Religious Land Use and Institutionalized Persons Act (RLUIPA), 42 U.S.C. §§ 2000cc to 2000cc-5.[1] The case is presently before the court on the motion for summary judgment filed by D. Anderson, R. Hall, W. Smith, C. Barnette, J. Taylor, A. Kilbourne, D. Still, A.D. Robinson, and Lieutenant Combs, as well as the motion for summary judgment filed by R. Cochrane. For the reasons set forth below, Cochrane's motion for summary judgment will be denied and the motion for summary judgment filed by Anderson and the other remaining defendants will be granted in part and denied in part.

## Backgound

Talbert is presently incarcerated at Red Onion State Prison. He was previously incarcerated at Wallens Ridge State Prison, where the events giving rise to this action allegedly occurred. Talbert filed his original complaint on December 2, 2005. Since that time, he has filed multiple amendments. The court previously dismissed several claims, pursuant to 28 U.S.C. § 1915A(b)(1).

In the first of his remaining groups of claims, Talbert alleges that Anderson, Hall, Smith, Barnette, Taylor, Kilbourne, and Cochrane assaulted him on September 18, 2005, that the assault

---

[1] Although Talbert's original complaint did not include a RLUIPA claim, he later amended his complaint to include a claim under this statute.

was racially motivated, and that the assault was directly or tacitly authorized by Combs and Robinson. Talbert asserts constitutional claims of excessive force and race discrimination related to the incident. Talbert also asserts the following state law claims: conspiracy, assault and battery, malicious wounding, and negligence. In his second group of claims, Talbert alleges that Hall and Still violated his rights under the First Amendment and RLUIPA by confiscating his Muslim lessons on September 18, 2005 and refusing to return them.

All of the defendants have moved for summary judgment. The court issued Roseboro notices to Talbert following the filing of the defendants' motions. Since Talbert has now responded to each of the motions for summary judgment, the motions are ripe for disposition.

## Standard of Review

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment is properly granted if "there is no genuine issue as to any material fact and the ... moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). For a party's evidence to raise a genuine issue of material fact to avoid summary judgment, it must be "such that a reasonable jury could return a verdict for the non-moving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). In determining whether to grant a motion for summary judgment, the court must view the record in the light most favorable to the non-moving party. Terry's Floor Fashions, Inc. v. Burlington Indust., Inc., 763 F.2d 604, 610 (4th Cir. 1985).

## Discussion

A.  The Alleged Assault

To support his claims pertaining to the alleged assault, Talbert provides the following summary of events in his sworn declarations (docket #145). Talbert alleges that he was placed in a cell with a smoker on September 14, 2005. The smoke caused him to suffer chest pains, and on

2

September 18, 2005, he was escorted to the medical department by Barnette and Taylor. Along the way, Barnette and Taylor advised Talbert that Combs was upset with him. Upon entering the medical department, Talbert was placed in ambulatory restraints and examined by the nurse. While Talbert was requesting a cell transfer, Combs entered the room. Combs advised Talbert that he could not be moved over a weekend. When Talbert insisted that he needed to be moved immediately, Combs began calling Talbert "nigger" and advised Barnette and Taylor to "get this black scum up and say he refused to go back to [his] cell." Talbert was subsequently placed in a cell in the medical department. Approximately ten minutes later, Barnette, Taylor, Kilbourne, Smith, Hall, Anderson, and Cochrane arrived to escort Talbert to a segregation cell in the D-4 housing unit. Talbert alleges that the officers placed him in handcuffs and shackles, and that he complied with all of the officers' orders. While being escorted to the D-4 housing unit, Talbert and the officers walked by Combs. Combs allegedly told Talbert that he was going to "whip [his] ... ass." Likewise, upon entering the housing unit, the other officers began voicing a variety of racial slurs. The officers placed Talbert in cell D-406 and asked him to kneel down while they removed his shackles. Although Talbert allegedly complied with the officers' orders, the officers began attacking Talbert while he was still restrained. Talbert alleges that he received several blows to his face, head, torso, and back, and that the officers "chant[ed] racial slogans" during the attack. Talbert also alleges that Anderson "produced a rope" and said, "We done [sic] made niggers hang themselves up here on the mountain and we done [sic] killed nigger[s] up here."

As a result of the attack, Talbert alleges that his eye was "busted wide open," that his blood was in puddles on the floor, and that a piece of skin was ripped from his shoulder. Talbert further alleges that he sustained lacerations to his wrists and ankles, that he had multiple contusions on his

3

Case 7:05-cv-00736-GEC-mfu    Document 186    Filed 03/09/07    Page 3 of 16    Pageid#: 844

head, that he had cuts and scratches on his face, that he had knots between his legs, that he urinated blood, and that he suffered from blurred vision.

In response to Talbert's allegations, the defendants have provided a different version of events. The defendants contend that the incident at issue began when Talbert refused to return to his regular cell from the medical department. Talbert allegedly became disruptive and belligerent in the medical department, prompting Combs to request extra assistance escorting Talbert to a segregation cell. Specifically, the defendants allege that Talbert cursed, screamed, kicked a door, and threatened to kill Taylor. Talbert was subsequently escorted to segregation by Cochrane, Smith, Anderson, and Kilbourne. Along the way, Talbert continued to act in a belligerent and verbally disruptive manner. Once the group arrived at the segregation cell, Talbert was ordered to kneel so that his leg irons could be removed. After Talbert kneeled on the floor, Smith was able to successfully remove the leg iron from Talbert's left ankle. However, as Smith began removing the leg iron from Talbert's right ankle, Talbert lunged forward and kicked upward with his left leg, striking Smith in his chest. When Cochrane, Smith, Anderson, and Kilbourne attempted to place Talbert face down on the floor, Talbert continued to resist the officers' actions. The defendants allege that Talbert managed to crawl across the cell and under the bed, despite the officers' attempts to hold him down on the floor. According to the defendants, Talbert struggled so violently that the officers were unsure that they would be able to control him. However, staff members eventually gained control of Talbert and reapplied the leg iron on his left leg. Talbert was charged with five prison disciplinary violations as a result of the incident, and criminal charges were also filed against him.

The defendants also argue that Talbert's version of the events is unsupported by his medical records. The medical records indicate that on September 18, 2005 at approximately 12:35 p.m., Nurse C. Collins was called to the D-4 housing unit to examine Talbert after he was placed on the

4

floor by correctional officers. Collins noted that Talbert's only visible injury was a one-inch laceration to his right eye and that the laceration was draining. Collins cleansed the area with saline and applied steri-strips to the laceration. Collins noted that the injury would be monitored as needed.

The following day, Talbert was transferred to Red Onion State Prison, where he was examined by Nurse Yates. Yates noted that Talbert had a one-half centimeter cut near his right eye brow and a one centimeter cut on his left wrist. Yates also noted that Talbert had an abrasion on his right shoulder that was cleaned and treated with a topical ointment. Talbert was placed on the schedule to see the doctor. Talbert was subsequently examined by Dr. Williams on September 23, 2005. Williams noted that Talbert was doing well with his asthma medications and that Talbert would receive follow-up care for asthma. On September 27, 2005, Talbert complained of back pain and blurred vision in his right eye. Talbert was placed on the schedule to see the doctor. On September 30, 2005, Talbert was examined again by Dr. Williams. Talbert advised Williams that he had been "attacked" by officers at his previous facility on September 18, 2005. Although Talbert complained of blurred vision in his right eye, Williams noted that Talbert was unable to describe the blurriness. Talbert also complained of numbness on the right side of his head and face, a "beating pain" on the back of his head, and migraine headaches. Additionally, Talbert alleged that skin was ripped off of his shoulder, that sharp pains were radiating from his lower back to his groin, and that he had urinated blood. Dr. Williams noted that all of the symptoms allegedly started on the day of the attack, but that Talbert had not mentioned them during his initial examination. Upon examination, Dr. Williams noted mild tenderness in Talbert's neck muscles, an abrasion on Talbert's right shoulder, and multiple contusions. However, Dr. Williams found no objective findings to support Talbert's complaint of numbness. Dr. Williams prescribed Motrin for Talbert's

5

headaches, scheduled him for a urinalysis, and referred him to the eye doctor for his complaints of blurred vision. On October 5, 2005, Talbert allegedly refused to accept the urinalysis cup. Likewise, on October 14, 2005, Talbert allegedly refused to have his blood drawn for testing.

In response to the defendants' motions for summary judgment, Talbert denies having ever been combative or aggressive in any way, and insists that he complied with all of the orders that he received on the date in question. Talbert also denies having crawled under the bed, and emphasizes that he is physically unable to kick his left leg in the manner alleged by the defendants because of preexisting injuries to his leg. Talbert also alleges that he was not properly examined by Nurse Collins after the incident and that she failed to document all of his injuries. Additionally, Talbert alleges that a nurse at Red Onion refused to test his urine.

Talbert also argues that the injuries to his face and shoulder can be seen on a videotape from September 19, 2005. This videotape, which has been reviewed by the court, contains footage that was recorded when Talbert arrived at Red Onion after being transferred from Wallens Ridge. When Talbert first exited the prison van, K. McCoy, a correctional officer at Red Onion, directed the cameraman to focus on the injury on Talbert's face. It appears that Talbert had an abrasion above his right eyebrow, as well as a possible contusion on the right side of his face, which ran from his right eye to his mouth. In addition to these facial injuries, Talbert advised McCoy that he had injuries on his shoulder and wrists. Talbert was later asked to remove his shirt so that the officers could videotape his shoulder. The video camera then focused on what could be described as a sizeable, round area of raw flesh on Talbert's right shoulder. Talbert also advised the officers that he had a "big bump" on his inner thigh and that he had been urinating blood.

6

1.  Excessive Force

It is well established that the use of excessive force upon an inmate by prison officials violates the Eighth Amendment's prohibition against cruel and unusual punishment. See Hudson v. McMillian, 503 U.S. 1, 5 (1992); Whitley v. Albers, 475 U.S. 312, 319 (1986). To prevail on an excessive force claim, an inmate must show, objectively, that the use of force was contrary to contemporary standards of decency and that he suffered more than de minimis pain or injury. See Hudson, 503 U.S. at 7, 9. He must also satisfy a subjective component by showing that the force was applied "maliciously and sadistically for the purpose of causing harm" and not "in a good faith effort to maintain or restore discipline." Whitley, 475 U.S. at 320-321; see also Williams v. Benjamin, 77 F.3d 756, 761 (4th Cir. 1996).

According to Talbert's version of events, as provided in his sworn declarations, no force was necessary. Without provocation, Anderson, Hall, Smith, Barnette, Taylor, Kilbourne, and Cochrane repeatedly rendered blows to his head, face, and body, while he was fully restrained. Construed in the light most favorable to Talbert, the court concludes that his allegations create a genuine issue of material fact as to whether the correctional officers used force against him "maliciously and sadistically for the purpose of causing harm" and not "in a good faith effort to maintain or restore discipline." Whitley, 475 U.S. at 320-321; Williams, 77 F.3d at 761.

As for the extent of his injuries, Talbert alleges in his sworn declarations that his eye was "busted wide open," that a piece of skin was ripped from his shoulder, that he had lacerations on his wrists and ankles, that he had multiple contusions, that he had knots between his legs, that he was urinating blood, and that he suffered from blurred vision. Although Nurse Collins' examination notes indicate that Talbert's only visible injury following the incident was a one-inch laceration to

7

his left eye, Talbert contends that Nurse Collins failed to properly examine him after the incident, and that she did not document all of his injuries. Moreover, as previously stated, the videotape from Red Onion State Prison shows facial injuries, as well as an injury to Talbert's shoulder. Although the shoulder injury is described in Talbert's medical records as a mere "abrasion," it could arguably be described as an area of raw flesh or "ripped skin," as described in Talbert's declarations. Additionally, Talbert complained of urinating blood when he arrived at Red Onion, as well as when he was examined by Dr. Williams on September 30, 2005. Although the medical records indicate that Talbert refused to accept a urinalysis cup, Talbert disputes this allegation and contends that a nurse refused to perform a urinalysis. Construing the evidence in the light most favorable to Talbert, the court concludes that a genuine issue of material fact exists as to whether Talbert suffered more than de minimis injuries.

The defendants also argue that Anderson, Hall, Smith, Barnette, Taylor, Kilbourne, and Cochrane are entitled to qualified immunity with respect to Talbert's excessive force claim. However, government officials are entitled to qualified immunity from civil liability for performing discretionary functions only insofar as their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). In determining whether a government official is entitled to qualified immunity, the court must "(1) identify the right allegedly violated, (2) determine whether the constitutional right violated was clearly established at the time of the incident, and (3) evaluate whether a reasonable official would have understood that the conduct at issue violated the clearly established right." Henderson v. Simms, 223 F.3d 267, 271 (4th Cir. 2000).

In this case, the constitutional right at issue is the right to be free from cruel and unusual punishment under the Eighth Amendment. It has been clearly established for some time that the use

8

of excessive force by a prison official violates this constitutional right. See Hudson, 503 U.S. at 5; Whitley, 475 U.S. at 319. Talbert has presented evidence that the aforementioned defendants severely assaulted him without provocation while he was fully restrained. If Talbert's version of the facts is true, a reasonable person in the defendants' positions would have known that their actions violated Talbert's right to be free from cruel and unusual punishment. For these reasons, the court concludes that Anderson, Hall, Smith, Barnette, Taylor, Kilbourne, and Cochrane are not entitled to qualified immunity and that their motions for summary judgment must be denied with respect to Talbert's excessive force claim.

2.  Race Discrimination

To the extent Talbert alleges that the assault was racially motivated, such claim also survives summary judgment. The Equal Protection Clause of the Fourteenth Amendment protects prison inmates from invidious discrimination on the basis of race. Davis v. Lester, 156 F. Supp. 2d 588, 595 (W.D. Va. 2001). In order to establish an equal protection claim, an inmate must show that "he has been treated differently from others with whom he is similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination." Morrison v. Garraghty, 239 F.3d 648, 654 (4th Cir. 2001). In this case, Talbert alleges in his sworn declarations that Anderson, Hall, Smith, Barnette, Taylor, Kilbourne, and Cochrane used racial slurs while they attacked him, and that Anderson produced a rope and bragged of hanging and killing "niggers." Construed in the light most favorable to Talbert, a reasonable jury could find that he was treated differently from similarly situated inmates and that the unequal treatment was the result of intentional race discrimination. See Merritt v. Hawk, 153 F. Supp. 2d 1216, 1225 (D. Co. 2001) (holding that an inmate's allegations were sufficient to suggest that he was treated differently than similarly situated inmates for purposes of his equal protection claim, where the inmate alleged that numerous racial

epithets were aimed at him during an alleged assault); Burton v. Livingston, 791 F.2d 97, 100 (8th Cir. 1986) (finding that a guard's death threats, accompanied by racial epithets, "strongly suggest[ed] that the prisoner would have been treated differently had he not been black"). Moreover, because the Fourteenth Amendment right to be free from race discrimination was well established at the time of the alleged incident, and the court finds no basis upon which the aforementioned defendants could have reasonably believed they had a legitimate justification for acting as they allegedly did, the court is unable to conclude that they are entitled to qualified immunity with respect to Talbert's discrimination claim. See Davis, 156 F. Supp. 2d at 595.

3. Supervisory Liability

Talbert also alleges that Lieutenant Combs and Warden Robinson are subject to supervisory liability for the use of excessive force. The United States Court of Appeals for the Fourth Circuit has set forth three elements that are necessary to establish supervisory liability under § 1983: (1) that the supervisors had actual or constructive knowledge that their subordinates were engaged in conduct that posed a "pervasive and unreasonable risk" of constitutional injury to the plaintiff; (2) that the supervisors' response to that knowledge was so inadequate as to show "deliberate indifference to or tacit authorization" of the offensive conduct; and (3) that there was an "affirmative causal link" between the supervisors' inaction and the particular constitutional injury suffered by the plaintiff. Shaw v. Stroud, 13 F.3d 791, 799 (4th Cir. 1994) (internal quotations omitted).

a. Combs

To support his claim against Combs, Talbert alleges in his sworn declaration that Combs was present when the other officers assaulted him, that the assault was ordered by Combs, and that Combs failed to intervene. Combs has submitted an affidavit in which he flatly denies these

10

allegations. However, construing the evidence in the light most favorable to Talbert, the court concludes that a reasonable jury could find that Combs knew of and disregarded an excessive risk to Talbert's safety and that a causal link exists between Combs' conduct and the alleged harm. Id. Additionally, if Talbert's version of the facts is true, a reasonable person in Combs' position would have known that his actions violated Talbert's clearly established constitutional rights. For these reasons, the court concludes that Combs is not entitled to qualified immunity, and that the defendants' motions for summary judgment must be denied with respect to this claim.

        b.     Robinson

Talbert also alleges that Robinson was aware of widespread incidents of assault at Wallens Ridge and that he did not take any action to end these incidents. Robinson has submitted an affidavit in response to Talbert's allegations. Robinson avers that correctional officers employed by the Virginia Department of Corrections receive structured training on the need for force and the application of force, and that officers are directed to only use force when it is reasonably necessary to gain control or protect themselves or other individuals from physical harm. Robinson further avers that force may not be used for vindictive or retaliatory purposes. Additionally, Robinson emphasizes that the number of incident reports pertaining to the use of force at Wallens Ridge significantly decreased in 2005.

In response to Robinson's affidavit, Talbert submitted an affidavit from Carlos Sanchez.[2] Sanchez alleges that he and another inmate were brutally assaulted on November 10, 2005, by some of the same officers who are named as defendants in this case. However, even assuming the truth of Sanchez's allegations, his description of this single incident, which occurred after the incident at

---

[2]Talbert also submitted affidavits from Ira Madison and Eric Vann. However, Madison and Vann complaint of incidents that occurred at Red Onion rather than at Wallens Ridge.

11

issue in this case, is insufficient to establish that Robinson had knowledge of a "pervasive" and "unreasonable" risk of harm to Talbert, or that Robinson acted with deliberate indifference. See Shaw, 13 F.3d at 799. Consequently, the court concludes that Robinson is entitled to summary judgment.[3]

    4.    State Law Claims

Talbert also raises several state law claims pertaining to the use of force on September 18, 2005, including claims for conspiracy, assault and battery, and negligence. The defendants argue that all of Talbert's state claims are barred by the doctrine of sovereign immunity. However, this argument is without merit. It is well established that state employees are not entitled to the protection of sovereign immunity when they are accused of an intentional tort or acts constituting gross negligence. See Coppage v. Mann, 906 F. Supp. 1025, 1047 (E.D. Va. 1995); Burnham v. West, 681 F. Supp. 1169, 1172 (E.D. Va. 1988); Nat'l R.R. v. Catlett Volunteer Fire Co., Inc., 241 Va. 402, 404 S.E.2d 216, 219 n.2 (Va. 1991); Tomlin v. McKenzie, 251 Va. 478, 468 S.E.2d 882, 884 (Va. 1996); Fox v. Deese, 234 Va. 412, 362 S.E.2d 699, 706 (Va. 1987); Lawhorne v. Harlan, 214 Va. 405, 200 S.E.2d 569, 572 (Va. 1973); Elder v. Holland, 208 Va. 15, 155 S.E.2d 369, 372-373 (Va. 1967). Because Talbert has alleged intentional and/or grossly negligent acts on the part of

---

[3] The court notes that on January 19, 2007, five months after he filed a response to Robinson's motion for summary judgment, Talbert filed motions seeking the production of all "complaints and grievances from a two-year time span on cases of excessive force and race discrimination." (Docket #168 and #169). To the extent Talbert seeks to obtain the documents for purposes of summary judgment, Talbert's motions are untimely and must be denied. Moreover, the court is unable to conclude that any of the requested documents would affect the court's decision with respect to Talbert's claim against Robinson. The mere fact that other inmates filed grievances complaining about race discrimination or the use of excessive force would not establish that Robinson acted with deliberate indifference to the inmates' complaints or that any inaction by Robinson affirmatively caused Talbert's constitutional injuries. See Shaw, 13 F.3d at 799.

12

Anderson, Hall, Smith, Barnette, Taylor, Kilbourne, Cochrane, and Combs, these defendants are not entitled to sovereign immunity.

The defendants also argue that Talbert's state law claims are barred by the Virginia Tort Claims Act, Va. Code Ann. § 8.01-195.1 et seq., because Talbert did not comply with the Act's procedural requirements. However, "the Virginia Tort Claims Act only abrogates the State's own immunity for negligence by its employees within the scope of their employment." Browning v. Vecellio & Grogan, Inc., 945 F. Supp. 930, 932 (W.D. Va. 1996) (emphasis added). "Nothing in the Act's terms requires [plaintiffs] to forego their common law remedies against individuals." Id. Accordingly, Talbert's state law claims are not barred by the Virginia Tort Claims Act, and the court will deny the defendants' motions for summary judgment with respect to these claims.

B.   The Confiscation of Talbert's Religious Materials

Talbert also claims that Hall and Still violated his rights under the First Amendment and RLUIPA by confiscating his Muslim lessons on September 18, 2005 and refusing to return them. To support these claims, Talbert alleges in his sworn declarations (docket #145) that he is a "Black Muslim of the Nation of Islam," that he was born into the Nation of Islam, and that all of his family members are Black Muslims. Talbert further alleges that his religion requires him to study the Muslim lessons every day, that the lessons were given by Prophet Master F. Muhammad and Elijah Muhammad, and that "these lessons make up the most important things of the Nation." Although Talbert indicates that he eventually received additional copies of the Muslim lessons from his family, Talbert contends that the confiscation of the lessons prevented him from practicing his religion for almost eight months.

13

The Free Exercise Clause of the First Amendment prohibits the adoption of laws designed to suppress religious beliefs or practices. See Morrison v. Garraghty, 239 F.3d 648, 656 (4th Cir. 2001). "[The First Amendment's] protections, including its directive that no law shall prohibit the free exercise of religion, extend to the prison environment." Id. (citing O'Lone v. Estate of Shabazz, 482 U.S. 342, 348 (1987); Ali v. Dixon, 912 F.2d 86, 88-89 (4th Cir. 1990)). However, an inmate's constitutional rights can be limited to achieve valid penological objectives. O'Lone, 482 U.S. at 348. When a prison official's decision infringes upon an inmate's First Amendment rights, the decision will nevertheless be upheld if it is "'reasonably related'" to promoting a legitimate penological interest. O'Lone, 482 U.S. at 349 (quoting Turner v. Safley, 482 U.S. 78, 87 (1987)).

RLUIPA prohibits governments from taking actions that impose a "substantial burden on the religious exercise of a person residing in or confined to an institution," unless the government demonstrates that the imposition of that burden furthers a "compelling government interest" by the "least restrictive means." 42 U.S.C. § 2000cc-1(a)(1)-(2). The statute defines "religious exercise" as "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc-5(7)(a). In order to prevail on a claim under this statute, a plaintiff must first demonstrate that the challenged practice or decision places a substantial burden on his exercise of sincere religious beliefs. 42 U.S.C. § 2000cc-2(b). If the plaintiff carries this burden, the government must then prove that the practice or decision furthers a compelling interest by the least restrictive means. Id.

In response to Talbert's free exercise claims, the defendants argue that Hall and Still are entitled to judgment as a matter of law because the lessons confiscated from Talbert's cell are not religious in nature. Relying on an affidavit from Still, the defendants argue that the lessons are from

14

the Five Percent organization, "a radical offshoot of the Nation of Islam," which "claims to be non-religious in nature." Additionally, the defendants emphasize that the Five Percent organization has been identified by the Virginia Department of Corrections (VDOC) as a security threat group, and that the VDOC prohibits literature pertaining to organizations that pose a security threat. In response to the defendants' arguments, Talbert specifically denies being a member of the Five Percent organization and insists that the lessons confiscated from his cell are Muslim lessons, which are "spirtual and completely religious in nature." Talbert also emphasizes that the fact that he currently has duplicate copies of the lessons in his possession demonstrates that the lessons are religious in nature and that they do not pose a security risk.

Construing the evidence in the light most favorable to Talbert, the court concludes that Hall and Still are not entitled to summary judgment with respect to Talbert's free exercise claims. Talbert has provided sufficient evidence to create a genuine issue of material fact as to the sincerity of his religious beliefs. Likewise, Talbert has set forth sufficient evidence, at this stage of the proceedings, to demonstrate that the confiscation of the lessons placed a substantial burden on his ability to practice his religion. See Lovelace v. Lee, 472 F.3d 174, 187 (4th Cir. 2006) ("[A substantial burden on religious exercise occurs when a state or local government, through act or omission, put[s] substantial pressure on an adherent to modify his behavior and to violate his beliefs.") (internal citations omitted). The court also finds that there is a dispute of material fact as to the precise nature of the lessons confiscated from Talbert's cell. While the defendants argue that the lessons are from the Five Percent organization and that they pose a threat to security, Talbert disputes these allegations in his sworn declarations and insists that they are traditional Muslim lessons. Given this dispute, the court is unable to conclude that the decision to confiscate the

15

lessons furthered a compelling penological interest for purposes of RLUIPA or was reasonably related to a legitimate penological interest for purposes of O'Lone, 482 U.S. at 349 and Turner, 482 U.S. at 87. Additionally, because it was clearly established at the time of the alleged violation that prison officials may not substantially burden an inmate's right to exercise his personal religious beliefs without some legitimate penological justification, and because the court is unable to conclude that it was objectively reasonable for Hall and Still to believe that Talbert's lessons were lawfully confiscated, they are not entitled to qualified immunity at this stage of the litigation. Accordingly, the court will deny the defendants' motion for summary judgment as to Talbert's free exercise claims.

## Conclusion

For the reasons stated, the motion for summary judgment filed by Anderson, Hall, Smith, Barnette, Taylor, Kilbourne, Still, Robinson, and Combs will be granted in part and denied in part, and the motion for summary judgment filed by Cochrane will be denied. Robinson will be dismissed from the case and the case will proceed to trial as to the remaining defendants.

The Clerk is directed to send certified copies of this opinion and the accompanying order to the plaintiff and counsel of record for the defendants.

**ENTER**: This 9th day of March, 2007.

*/s/ Jack Conrad*
United States District Judge